UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| BRAEDI ODIER, )<br>       Plaintiff, )<br>    v. )<br>HOFFMANN SCHOOL OF MARTIAL )<br>ARTS, INC. d/b/a THE SHARK )<br>ACADEMY d/b/a HOFFMANN KARATE, )<br>and GREGORY HOFFMANN, )<br>       Defendants. ) | Cause No.: 1:06-CV-369-TLS |

**OPINION AND ORDER**

This matter is before the Court on the Defendants' motion for summary judgment (DE 33) and the Plaintiff's motion for partial summary judgment (DE 35). For the reasons explained below, the Court denies the Defendants' motion for summary judgment and grants the Plaintiff's motion for partial summary judgment.

**PROCEDURAL BACKGROUND**

On October 10, 2006, Braedi Odier sued the Hoffmann School of Martial Arts, Inc. ("the Hoffman School"), Transworld Systems, Inc. ("Transworld"), and Gregory Hoffmann in the Allen Superior Court in Fort Wayne, Indiana. Her complaint asserts a claim against the Hoffmann School for deceptive practice in violation of Indiana Code § 24-5-0.5-3(a), a claim against Transworld for a Fair Debt Collection Practices Act violation under 15 U.S.C. § 1692e, a claim against the Hoffmann School and Transworld for Truth in Lending Act violations under 15 U.S.C. § 1638, a claim against the Hoffmann School and Gregory Hoffmann for fraud, and a claim against the Hoffmann School for unjust enrichment. The case was removed to this Court

on November 15, 2006. On April 25, 2007, the Plaintiff and Transworld stipulated to Transworld's dismissal from the case with prejudice.

The remaining Defendants filed a motion for summary judgment on January 22, 2008 (DE 33). The Plaintiff responded to that motion on March 3, 2008 (DE 41), and the Defendants replied on March 31, 2008 (DE 46). The Plaintiff filed a motion for partial summary judgment on the Truth in Lending Act claim on January 22, 2008 (DE 35). The Defendants responded to that motion on March 3, 2008 (DE 40), and the Plaintiff replied on March 31, 2008 (DE 45). Both motions are now ripe for ruling.

**SUMMARY JUDGMENT STANDARD**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To determine whether any genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in

depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).

A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the Court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). The Court must consider the evidence as a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999). The Court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Pursuant to local rule, the Court is to assume that the facts claimed by the moving party and supported by admissible evidence are admitted to exist without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence. N.D. Ind. L.R. 56.1(b).

3

**FACTS**

The facts stated here are agreed to by the parties except where the Court indicates that a specific fact is alleged by a particular party.

The Hoffmann School is a Fort Wayne business that was incorporated under Indiana law in 1996. Defendant Gregory Hoffmann and his wife own the school, which has three karate instruction locations in Fort Wayne. Gregory Hoffmann serves as the president and registered agent of the company, and he manages and teaches the courses. The Hoffmann School administers programs that range from six months to thirty-six months in duration, and it sells instructions by the program rather than by the individual lessons. Over the past two years, at least one hundred students have signed contracts with the Hoffmann School for martial arts instruction.

Braedi Odier attended Tae Kwon Do classes at the Hoffmann School between the ages of eight and ten years old, ultimately achieving the level of brown belt. She stopped attending the Hoffmann School after receiving her brown belt. She graduated from high school in 2004 and began attending college part-time while working for a Fort Wayne cell phone company as a sales representative.

While she was working as sales representative, some time prior to October 11, 2005, Odier alleges that Hoffmann began recruiting her to enroll in a new karate program that would allow her to make extra money selling memberships for the Hoffmann School. After multiple discussions with Hoffmann, Odier visited Hoffmann's office to finalize the details of their arrangement. Because she had previous martial arts instruction, Hoffmann informed Odier that

4

the 36-month "Leadership Program" was the only program appropriate for her experience level.[1] The Leadership Program includes martial arts instruction for students with white through third-degree black belts. In addition to the martial arts instruction, the program teaches students various communication skills and techniques for recruiting new students. Part of this course involves the students actually recruiting other individuals to the Hoffmann School, although they are not financially compensated for this. Students in the Leadership Program can attend classes at any Hoffmann School location, but they cannot attend classes for the Instructor's Certification Program without an invitation. The Leadership Program courses are held in the evenings during the week and on Saturday mornings.

The Instructor's Certification Program is a course designed to train students to become instructors for the Hoffmann School. If students receive this certification, the school considers hiring them as employee instructors and paying them for recruiting additional students. It is not clear from the record what the precise requirements of this program are. Hoffmann told Odier that one of the benefits of signing up for the Leadership Program was the possibility of becoming an instructor. No student has ever completed either the Leadership Program or the Instructor Certification Program.

During the October 11 meeting, Hoffmann explained the benefits and requirements of the Leadership Program using a flip chart. After displaying a preprepared sheet of paper listing the benefits of the Leadership Program, Hoffmann turned to a blank sheet of paper. He then wrote

---

[1] The Hoffmann School offers six different programs: the Basic Program for $795, payable in six monthly installments; the Family Basic Program for $1590, payable in six monthly installments; the Masters Club for $5,845, payable in thirty-five or thirty-six monthly installments; the Family Masters Club for $11,690, payable in thirty-five or thirty-six monthly installments; the Leadership Program for $7595 (the Plaintiff got a discount for being a former student), payable in thirty-five or thirty-six monthly installments; and the Family Leadership Program for $15,190, payable in thirty-five or thirty-six monthly installments. (Def. Resp. to Pl. First Set of Interrogs. 4, DE 37-10.)

that the price of the program was $200 per month for thirty-six months. After completing the flip chart, Hoffmann retrieved a contract titled "Leadership Agreement" for Odier to sign.

The contract provides that "[f]or and in consideration of the sum of $7200.00, to be paid as hereinafter stated, Hoffmann Karate, The Shark Academy, does hereby agree to provide instruction to the Student in martial arts for a period of 36 months." (Leadership Agreement 1, DE 1.) The parties agree that this amount was due upon Odier signing the contract. The contract also lists what it calls a "cash price" of $7200 and indicates that there is no down payment. The "due by" line is left blank. The contract also contains the following relevant provisions.

> **LATE FEES & COLLECTIONS**
> If payment is past five (5) days of payment due date, an additional $10.00 must be paid to Hoffmann Karate, The Shark Academy or its assignees. If Hoffmann Karate, The Shark Academy or its assignees has to collect this and/or any amount, all reasonable attorney fees and court costs incurred will be the responsibility of the undersigned. This agreement can be called for full payment if the undersigned is over 30 days late in payments. A $50.00 handling fee, court costs, and all charges incurred to collect this account will be charged if sent for collection.
>
> * * *
>
> **CONDUCT**
> Student shall faithfully comply with all the rules and regulations of the school and the traditions of the martial arts. These rules and regulations may be given orally or may be posted at the martial arts facility. If Student does not comply with the rules and regulations, this agreement and membership can be canceled by Hoffmann Karate, The Shark Academy or its assignees.
>
> * * *
>
> **RIGHT OF CANCELLATION**
> a) You may cancel this contract in writing by midnight of the 3rd full business day from the below signed date without penalty or obligation. . . .
>
>     . . . .
>
> e) Hoffmann Karate, The Shark Academy or its assignees reserves the right to cancel this agreement for any reason at any time.

\* \* \*

**ATTENDANCE**
All parties herein acknowledge that regular class attendance is essential for Student programs and understand that it is the Student's responsibility to attend all classes and that the undersigned is obligated to make payments whether or not the Student attends class and that failure to complete the lessons is not a waiver of obligation to pay the tuition in full. The undersigned understands that tuition is not affected by lesson schedule and/or attendance. Hoffmann Karate, The Shark Academy reserves the right to change schedule at any time, without notice or approval by Student or the undersigned.

(Leadership Agreement 1–2, DE 1.)

Before she signed the agreement, Odier claims that she expressed her concern to Hoffmann that the contract seemed to indicate that she was agreeing to pay for thirty-six months of instruction, but she was planning to move out of the state eighteen months later. She says that Hoffmann told her that they would be able to work something out and that she would have a thirty-day trial period within which she could cancel the contract. This was consistent with Hoffmann's business card and signs posted in his office advertising such a trial period, although the trial period was actually only available to students who had not previously taken lessons at the Hoffmann School before.

Odier then signed the agreement. Students are normally required to make a down payment, but since Odier was a former student she was not required to pay any money up front, and the agreement stated that her first payment of two hundred dollars was due on November 1, 2005. Odier attended two classes within the next thirty days. Those classes only dealt with various methods of selling memberships to the Hoffmann School, and Odier decided she was no longer interested in participating in the program. Within the first thirty days, Odier claims she made at least three attempts to cancel her enrollment. She says she left unreturned phone messages with Hoffmann and visited various Hoffmann School locations to try to speak to

someone about withdrawing her enrollment, all to no avail. She claims she also continued trying to contact Hoffmann to cancel, with no success, even after the thirty-day period had expired.

Odier made only two monthly payments. She continued receiving bills, but she never went to any more classes and never paid any more money to Hoffmann School. In the fall 2006, a collection agency called an informed Odier that she owed the Hoffmann School over seven thousand dollars. Between 2004 and 2007, approximately one-third of the Hoffmann School's Leadership Agreements were referred to collection agencies.

## ANALYSIS

**A.  Truth in Lending Claim**

The parties have filed cross-motions for summary judgment on the Plaintiff's claim that the Hoffman School violated the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* The Hoffman School concedes that the Leadership Agreement does not list the information required by the Truth in Lending Act, but it argues that since no credit was extended, the Act does not govern the agreement. The Plaintiff argues that because the $7200 debt was due immediately, and the Hoffman School allowed her to defer payment of that debt, the school extended her credit and the agreement is therefore governed by the Act.

The Truth in Lending Act was enacted in 1968 "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601. Congress delegated authority for the implementation of the Act to the Federal Reserve Board, 15 U.S.C.

§ 1604, and the comprehensive set of rules for regulating truth in lending is contained in what is known as Regulation Z. "[D]eference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z. Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive . . . ." *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980).

The Act requires that for "each consumer credit transaction other than under an open end credit plain," a creditor must disclose the following: (1) the identity of the creditor required to make disclosure; (2) the "amount financed," using that term (this is the amount of credit of which the consumer has actual use); (3) a statement of the consumer's right to obtain a written itemization of the amount financed; (4) the "finance charge," using that term; (5) the finance charge expressed as an "annual percentage rate," using that term; (6) the sum of the amount financed and the finance charge, using the term "total of payments;" and (7) the number, amount, and due dates or period of payments scheduled to repay the total of payments. 15 U.S.C. § 1638(a)(1)–(7). A consumer credit transaction occurs when "credit is offered or extended to a consumer primarily for personal, family, or household purposes" by a creditor. 12 C.F.R. § 226.2(12) (2008).

Credit is "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(e); *see also* 12 C.F.R. § 226.2(14). A consumer is a "natural person to whom consumer credit is offered or extended." 12 C.F.R. § 226.2(11). A creditor is

> a person who both (1) regularly extends, whether in connection with loans, sales or property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit

9

transaction is initially payable . . . .

15 U.S.C. § 1602(f). "A person regularly extends consumer credit only if it extended credit . . . more than 25 times . . . in the preceding calendar year." 12 C.F.R. § 226.2(a)(17) n.3. While the Act defines credit as the right "to defer payment of debt or to incur debt and defer its payment," 15 U.S.C. § 1602(e), "debt" is not defined in the Act. Nonetheless, the term "debt" likely refers to a legally enforceable obligation to pay money. *See* William D. Warren & Thomas R. Larmore, *Truth in Lending: Problems of Coverage*, 24 Stan. L. Rev. 793, 796 (1972); *but see Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 380 (Douglas, J., dissenting in part) ("A debt, however, is more than a binding contractual obligation to pay a sum of money in the future upon the performance of certain conditions by the other party to the contract. It is an unconditional obligation to pay.") (citing 3A A. Corbin, Contracts § 691 (1960)).

A creditor who fails to comply with the requirements imposed by the Act is amenable to suit for actual damages, statutory damages, and reasonable attorney's fees. 15 U.S.C. § 1640(a).

The only element in dispute here is whether the Hoffmann School's Leadership Agreements extend "credit" and are therefore subject to the Truth in Lending Act. The Plaintiff argues that because the $7200 debt arose immediately when she signed the Leadership Agreement and payment was deferred over thirty-six monthly payments, the Hoffmann School extended her credit. The Hoffmann School responds with three arguments in support of its contention that it did not violate the Truth in Lending Act: (1) the Leadership Agreement did not state or otherwise indicate that credit was being extended; (2) the Hoffmann School complied with Indiana's requirements for health spa services; and (3) the Leadership Agreement could not state a finance charge because there was no such charge.

The Hoffmann School's first argument, that no credit was extended since the agreement did not state any interest charge or any price other than a "cash price," is circular. The analysis of the Plaintiff's truth in lending claim entails first a determination of whether any credit was extended (giving rise to disclosure requirements), and, if the answer to that question is yes, then a determination of whether the Hoffmann School made adequate disclosures. The Hoffmann School cannot prevail on this claim by arguing that since it did not disclose any interest or finance charge, it did not extend any credit, and was therefore not required to disclose any interest or finance charge. If this type of argument were to prevail, it is difficult to see how any consumer could ever prevail on a claim under the Act.

The Hoffmann School's argument that it operates as a health spa service under Indiana law seems to be factually correct, but it is beside the point. Indiana law requires that any business entity (with exceptions not relevant here) that offers "instruction, training, or assistance in physical culture, bodybuilding, exercising, reducing, figure development or any other health spa service" to the public must conform its contracts to certain requirements. Ind. Code § 24-5-7-1. Contracts with customers must be in writing, and a copy must be furnished to the customer at the time of formation. Ind. Code § 24-5-7-2. The contract cannot require payments or financing for a period over three years, Ind. Code § 24-5-7-3, it must provide that performance of the services will begin within forty-five days of formation, Ind. Code § 34-5-7-4, it must allow for a customer's right of cancellation within three business days, Ind. Code § 24-5-7-5, and it must allow for a right of cancellation at any time in the event of death or disability, Ind. Code § 24-5-7-6.

Compliance with a state statute cannot not relieve a party of its obligation to comply with

11

a federal statute unless federal law so provides. U.S. Const. art. VI, cl.2. The Truth in Lending Act provides that, with certain exceptions that do not apply here, it does "not annul, alter, or affect the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter and then only to the extent of the inconsistency." 15 U.S.C. § 1610. Here the Indiana laws for health spa services compliment the Truth in Lending Act, and the Hoffman School is required to comply with both bodies of law. The Indiana Code even provides that "[t]he provisions of this chapter [pertaining to health spa services] are not exclusive and do not relieve the parties from compliance with other applicable provisions of law." Ind. Code § 24-5-7-9. As a matter of both federal and state law then, the Hoffmann School's compliance with the health spa services requirements cannot serve as a defense to an alleged violation of the Truth in Lending Act.

  The Hoffmann School's third argument, that no finance charge could be stated because nothing was financed, is belied by the Hoffmann School's statement of material facts. The school acknowledges that students were offered a discount to pay the full cost of a course up front (although it does not say how much that discount was), which means students who paid up front paid less for a course than students who paid through a monthly installment plan. (Br. in Supp. of Mot. for Summ. J. 7, DE 34). Calling this a "discount" for paying up front rather than a "finance charge" for not paying up front does not change the fact that the Hoffmann School allowed students to incur a debt and defer payment on it, which is the definition of "credit" under the Truth in Lending Act. 15 U.S.C. § 1602(e).

  An analogous credit arrangement was at issue in *Joseph v. Norman's Health Club, Inc.*,

386 F. Supp. 780 (D. Mo. 1974), *overruled on other grounds by Joseph v. Norman's Health Club, Inc.*, 532 F.2d 86 (8th Cir. 1976).[2] In *Joseph*, the plaintiffs purchased lifetime memberships in health clubs, paying between $300 and $360 dollars for such a membership. Customers could purchase memberships of varying durations, but ninety-eight percent of them purchased the lifetime variety. When the plaintiffs signed up, they signed promissory notes agreeing to pay 24 monthly installments of $12.50 if they signed up when the price was $300 or $15 if they signed up when the price was $360. The health clubs would then sell any promissory notes that they could to various finance companies for a discounted cash price. A member would receive a ten percent discount if they paid in full within forty-five days of initiating membership, although only fewer than 1 percent of members took advantage of this opportunity.

The Court in *Joseph* found that the health clubs had extended credit, reasoning that because members could pay less by paying in full up front, the difference between the full price and the discounted price constituted an extension of credit that was required to be disclosed. *Id.* at 789. Similarly, in this case, the Hoffmann School gave students a discount for full up-front payment and therefore extended credit in the same manner. As in *Joseph*, the difference between the discounted price offered for full up-front payment and the regular price for paying through an installment plan constitutes a charge for financing a debt.

The Hoffmann School argues that because the contract states a "cash price" of $7200, and the monthly $200 payments total $7200, none of the tuition is financed and the school is not a

---

[2] The Plaintiff's citation for this case is actually to the Court of Appeals' decision, which the Defendants correctly observe has been abrogated by statute. However, the Court of Appeals' decision did not address the issue in dispute in this case (whether credit is extended with an installment payment plan and a discount for up-front payment), and the only relevant analysis is found in the district court opinion for that case. That analysis was neither overruled nor abrogated by statute. Accordingly, this Court focuses on the district court opinion.

13

creditor under the Act. Instead, it argues, the payment arrangement simply reflects an installment contract. This ignores the provision under the Truth in Lending Act that says the Act covers credit that is extended either by the requirement of a finance charge *or* by making a debt "payable by agreement in more than four installments." 15 U.S.C. § 1602(f). There is no dispute here that the Plaintiff incurred a $7200 debt when she signed the agreement, and that the debt was payable pursuant to that agreement in more than four installments.

The Supreme Court has explained why the Hoffmann School's unitary price argument does not necessarily foreclose liability under the Truth in Lending Act.

> One means of circumventing the objectives of the Truth in Lending Act, as passed by Congress, was that of "burying" the cost of credit in the price of goods sold. Thus in many credit transactions in which creditors claimed that no finance charge had been imposed, the creditor merely assumed the cost of extending credit as an expense of doing business, to be recouped as part of the price charged in the transaction. Congress was well aware, from its extensive studies, of the possibility that merchants could use such devices to evade the disclosure requirements of the Act. The Committee hearings are replete with suggestions that such manipulation would render the Act a futile gesture in the case of goods normally sold by installment contract.

*Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 366–67, (1973) (footnote omitted). It was in response to this concern that the Federal Reserve Board promulgated the Four Installment Rule (which was later incorporated into the statute itself), explaining that "it was imperative to include transactions involving more than four instalments under the Regulation since without this provision the practice of burying the finance charge in the cash price, a practice which already exists in many cases, would have been encouraged by Truth in Lending." *Id.* at 368 (quoting Federal Reserve Board Advisory Letter of Mar. 3, 1970, by J.L. Robertson).

The Hoffman School relies on Justice Powell's dissent in *Mourning* to argue that the Leadership Agreement does not constitute the financing of debt, but is rather an installment

14

contract. The *Mourning* case involved a woman who had contracted to purchase five-year subscriptions to four magazines to be paid for in thirty monthly payments of $3.95. *Id.* at 358. Similar to the Leadership Agreement in this case, the contract for the magazine subscriptions contained an acceleration provision providing that any default in payment would render the entire balance due. *Id.* The contract did not state the total purchase price and made no reference to service or finance charges. *Id.*

The majority took the position that the issue of whether this arrangement involved the extension of credit and violated the Truth in Lending Act was not properly before it, and the Court instead addressed the issue of whether the Federal Reserve Board had the authority to promulgate the Four Installment Rule. In a footnote, however, the majority stated that "[i]n some cases in which a consumer pays in installments for a magazine subscription, credit may not have been extended to the consumer." *Id.* at 362 n. 16. The majority did not elaborate on which types of installment subscription agreements do not extend credit, but because Justice Powell believed that the issue of whether consumer credit had been extended was properly before the Court, he focused more closely on that very issue.

Justice Powell adopted Professor Corbin's position that "[a] transaction may be an instalment contract without being a credit transaction at all. Both parties may agree to perform in instalments without promising to render any performance in advance of full payment of the price of each instalment so rendered." *Id.* at 384–85 (Powell, J., dissenting) (quoting 3A A. Corbin, Contracts § 687, p. 246 (1960)). He then explained that

> [a] transaction is commonly understood to involve credit when one party receives value in exchange for his unconditional promise to pay the other party for such value in the future. The mere fact that a party obligates himself in a contract to pay for goods or services in installments over a period of time does not render the

15

contract a credit transaction[.]

*Id.* at 384. Based on this understanding of what was meant by "extending credit" in the Act, Justice Powell concluded that if any credit was extended, it was from the customer to the seller, since she had to pay for sixty months worth of magazines in thirty months. *Id.* at 385. Accordingly, he concluded that the seller was not required to make any disclosures under the Act since no credit was extended to the customer. Most importantly for the purposes of this case, Justice Powell concluded that "[i]t would be inconsistent with [the] legislative history to read 'extension of credit' to include every noncancellable installment obligation," and instead "extension of credit" means "the receipt of goods or services in advance of paying for them." *Id.* at 386 n. 4.

The Hoffmann School argues that, consistent with Justice Powell's analysis, the Leadership Agreement is an installment contract that does not extend credit. There are several problems with this argument, not the least of which is the fact that Justice Powell's position in dissent was not adopted by the majority of the Supreme Court, nor does it appear to have been subsequently adopted by the Federal Reserve Board.

Assuming that Justice Powell's definition of extending credit is what was intended by Congress, the Hoffmann School's arrangement with the Plaintiff still constitutes an extension of credit because it allowed for the receipt of services in advance of paying for them. The Leadership Agreement provides that the program begins on November 1, 2005, (Leadership Agreement 1, DE 1), but the Hoffmann School did not expect payment until December, (Payment Records, DE 37-15). The Hoffmann School's argument therefore fails on its own terms, since it offered martial arts instruction in the month of November but did not expect

16

payment until December. Regardless, the Court also finds that the Leadership Agreement is not an installment contract as a matter of contract law.

While Professor Corbin is certainly correct that an installment contract may not be an extension of credit as a matter of common law, and while Justice Powell could be correct that an installment contract may not be an extension of credit for purposes of the Truth in Lending Act, none of this says anything about whether the Leadership Agreement is itself an installment contract. "[A] divisible contract [or 'installment contract'] has been defined as one where both the performance by each party is divided into two or more parts, and the performance of each part by one party is the agreed exchange for a corresponding part by the other party." 15 Richard A. Lord, Williston on Contracts § 45:1 (4th ed. 2007). The three elements of a divisible contract are that: (1) the performance of each party is divided into two or more parts; (2) the number of parts due from each is the same; and (3) the performance of each part by one party is the agreed exchange for a corresponding party by the other party. Restatement (First) of Contracts § 266(3), cmt. (e) (2008).

The Leadership Agreement lacks the second element of an installment contract. The performance parts for each party are not divided equally to correspond with one another. The Leadership Agreement requires the same measure of performance from the Plaintiff each month, but it does not demand the same from the Hoffmann School. While the Plaintiff must pay $200 each month, the Leadership Agreement allows the Hoffmann School to provide as many or as few lessons as it wishes. The agreement provides that "tuition is not affected by lesson schedule" and the school can "change schedule at any time, without notice or approval by Student." (Leadership Agreement 2, DE 1.) The agreement does not require a certain number of lessons

17

each week, each month, or even that lessons be provided at some point each and every month. While the agreement is explicit that the Plaintiff's payments are to be made in "consecutive monthly installments," the corresponding performance for the Hoffmann School is to provide instruction "for a period of 36 months."

Aside from the fact that performance is not measured in like manner for both parties, the Plaintiff cannot cancel the agreement in advance of receiving instruction after the first 72 hours have expired since the agreement was signed. Justice Powell did not believe that every noncancellable installment obligation constitutes an extension of credit, but it may be that the ability to cancel an agreement is what distinguishes between agreements that do extend credit and those that do not under the Truth in Lending Act. Take, for example, insurance premiums. "Insurance premium plans that involve payment in installments with each installment representing the payment for insurance coverage for a certain future period of time, *unless the consumer is contractually obligated to continue making payments*[,] . . . are not considered credit for the purposes of the regulation. 12 C.F.R. § 226, Supp. I, § 226.2, 2(a)(14)(1) (emphasis added). Conversely then, plans that require consumers to continue making payments do qualify as extensions of credit under the act.

It appears that the Federal Reserve Board does believe that the ability to cancel an agreement plays an important (if not determinative) role in deciding whether or not an agreement to provide a service in exchange for an agreement to pay in installments constitutes an extension of credit. This may mean that karate instructors, or, say, fitness facilities, do not extend credit when they enter into contracts similar to the Leadership Agreement in this case but allow customers to cancel the agreement without having to pay for services beyond those for which

they have already paid.

Immediately upon signing the Leadership Agreement, the Plaintiff was indebted to the Hoffmann School in the amount of $7200. The agreement allowed the Plaintiff to pay the debt off in more than four installments. This arrangement constituted an extension of credit, and the Hoffmann School was therefore required to make the disclosures required by the Truth in Lending Act. Having failed to do so, the Plaintiff is entitled to judgment as a matter of law.

### B.     State Law Claims

All of the Plaintiff's state law claims are based on her allegations that Gregory Hoffmann told her that she could make extra money by signing the Leadership Agreement, that she was entitled to a 30-day free trial period to evaluate the Leadership Program, and that the Leadership Agreement was only a month-by-month obligation that she could withdraw from at any time. She claims that Hoffmann made these representations knowing them to be false. Hoffmann denies making any such representations. The resolution of these conflicting claims requires an assessment of the credibility of the two parties. "Credibility determinations, however, lie exclusively within the fact-finder's domain and are not appropriate for a district court to make at the summary judgment stage . . . ." *Townsend v. Fuchs*, 522 F.3d 765, 774 (7th Cir. 2008). The Defendants' motion for summary judgment on the state law claims must therefore be denied.

### ORDER

For the reasons stated herein, the Defendants' Motion for Summary Judgment (DE 33) is **DENIED**, and the Plaintiff's Motion for Partial Summary Judgment is **GRANTED** (DE 35).

SO ORDERED on June 30, 2008.

          s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT